# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DREW KATTI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 12 C 7076** |
| | ) | |
| **SGS NORTH AMERICA INC.,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Drew Katti was employed by Defendant SGS North America, Inc. ("SGS"), for nine months as a manager. In this action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, Katti alleges that he was the victim of discrimination on the basis of his sex and national origin, and in retaliation for his complaints. Katti believes that his direct supervisor, Gayle Velez "hated men," gave women preferential treatment, and ultimately terminated him, purportedly for performance reasons, while retaining women with worse records. SGS has moved for summary judgment on all of Katti's claims, and has provided Katti with the appropriate Local Rule 56.2 notice [105]. Katti's response is disappointing; he has failed to respond to the individually numbered paragraphs of Defendant's Local Rule 56.1 statement, and has relied in many instances on inadmissible material in an effort to establish disputes of material fact. The court nevertheless concludes, for reasons explained briefly here, that Katti has presented circumstantial evidence that satisfies the court, if barely, that his sex discrimination claim may proceed. His claims of national origin discrimination and retaliation are dismissed.

## FACTS

As contemplated by the court's rules, Defendant SGS has submitted a Local Rule 56.1 Statement in brief, numbered paragraphs, supported by citations to record materials. (Def.'s

Local Rule 56.1 Statement of Material Facts [106], hereinafter "SGS Statement.")  Though he is not represented by counsel, Plaintiff Katti holds a Ph.D. in chemistry, and could be expected to comply more carefully with the court's rules for summary judgment briefing.  Instead, Katti has not responded directly to Defendant's statement of facts, but has offered his own additional description of events, supported only in part by admissible evidence.  (Pl.'s Declatory [sic] Statement [115-1], hereinafter "Pl.'s Resp.")  The court adopts SGS's factual account, where it is properly supported and unrebutted, but has otherwise construed the record in the light most favorable to Katti, the non-moving party.

Defendant SGS performs "a wide range of analytical, bioanalytical and clinical trial testing services" for the pharmaceutical industry.  (SGS Statement ¶ 2.)  Early in 2011, SGS sought to hire a new manager of analytical services for its chemistry department at its Lincolnshire, Illinois location, one of several managers reporting to the department's director, Gayla Velez.  (*Id.* ¶¶ 12, 13; Katti Dep. [103-2], at 124; Velez Decl. [103-4] ¶ 2.)  Plaintiff Drew Katti, who holds a Ph.D. in Chemical Engineering/Analytical Chemistry and had been employed in the academic world, was selected for the position and began on September 15, 2011.  (SGS Statement ¶¶ 20, 22.)  When hired, Katti received a copy of the employee handbook, which sets forth SGS's equal employment and anti-harassment policies and directs employees to make complaints of discrimination or retaliation to their direct supervisors or to the next higher authority.  (*Id.* ¶¶ 26-29; Katti Dep. at 144, 146-7.)   Initially, Katti had no staff reporting directly to him.  (*Id.* ¶ 25.)   Defendant asserts that this was consistent with its practice for any "new management hire" (*id.*), but Katti testified at his deposition that Richard Bunnell, General Manager of SGS' Lincolnshire location and Velez' supervisor, had assured him in his interview he would have staff reporting to him within two weeks of starting the job.  (Katti Dep. at 131, 152.)  He noted, further, that the female who later replaced him did have two staff reporting to her.  (*Id.* at 189.)

Katti's initial assignments involved "writing reports and troubleshooting projects." (SGS Statement ¶ 30.) In late October or early November 2011, Velez assigned Katti to perform what she calls (without elaboration) a "validation," a project she expected would take him two to three weeks to perform. Velez noted that the "data pack" generated by this project was larger than she expected, which "suggested to [her] that Katti spent too much time on that task." (*Id.* ¶ 34.) She also noted that Katti used his own format for a report, rather than adhering to the template she had given him. (*Id.* ¶¶ 35, 36.) Katti consulted Velez "on almost a daily basis," seeking more assistance than she deemed appropriate and generating concerns about Katti's leadership ability. (*Id.* ¶¶ 37-39.) Velez was also concerned because an analyst, Pam Hecht ("Hecht"), complained that Katti's instructions were unclear, and because Katti had admitted that on one occasion he had "failed to contemporaneously record his development, a task required in order to be cGMP compliant."[1] (*Id.* ¶¶ 40-43.)

In early 2012, Hecht performed experiments, with instructions from Katti, on a topical anti-inflammatory drug, but those "experiments could not improve the method." (SGS Statement ¶¶ 44-47.) Katti met with Velez and with General Manager Richard Bunnell to discuss this project in March 2012; after that meeting, he disappointed Velez by demonstrating unfamiliarity with some "basic calculations" and by simply repeating the same unsuccessful experiments. (*Id.* ¶¶ 48-54.) Velez and Bunnell were also disappointed by Katti's performance working with a piece of equipment (referred to as the "Elemental Analyzer Project") in February 2012. Specifically, Katti failed to meet "multiple deadlines" and was unable to answer Velez's questions about the equipment. (*Id.* ¶¶ 55-59.)

Late in March, Bunnell met Don Castle, a Senior Vice President at SGS, to discuss a cost-cutting and reorganization initiative. (*Id.* ¶¶ 60-61.) Based on his own experience with

---

[1] Defendant has not explained what it means to be "cGMP compliant," but Plaintiff has identified this in interrogatory answers as an acronym for "current Good Manufacturing Practice." (*See* Pl.'s Am. Answers to Def.'s First Set of Interrogs. [115-2], hereinafter "Interrog. Answers", at 11.)

Katti and on information he had received from Velez, Bunnell concluded that Katti was inefficient, unable to follow directions or manage time, and not worthy of his $80,000 salary. (*Id.* ¶ 62.) In a March 2012 e-mail to SGS' human resource department, Bunnell identified Katti and three women as appropriate for layoff. (*Id.* ¶ 64; E-mail from Bunnell to Durst, 3/2/2012, Ex. D to Bunnell Decl. [103-5].) In his e-mail, Bunnell described one of the other employees targeted for layoff, a female assistant manager under Gayla Velez's direction, as "weak in managing important clients" and noted that she "does not adequately monitor and manage the work of the lab to ensure critical client work" is handled appropriately. (*Id.*) At some point after that e-mail message, however, Bunnell discussed the assistant manager's situation with Velez, who told him that the employee was "a longtime SGS employee with a history of good performance evaluations." Bunnell withdrew the recommendation that this female employee be laid off. (Supplemental Decl. of Richard Bunnell [120] ¶ 3.) Ultimately, Katti and a male hourly worker of East Asian origin were the only chemistry department employees laid off, along with three other workers, in June of that year. (SGS Statement ¶ 66.) Although SGS asserts that Gayla Velez "did not select or otherwise have any influence over the five employees who were part of the payroll reduction," Bunnell's account demonstrates that Velez did influence the decision with respect to her female assistant manager. Moreover, Velez's own sworn declaration states that she had no influence over the selection of any employees *"[o]ther* than Katti or the [hourly worker]." (Velez Decl. [103-4] ¶ 20 (emphasis added).)

Bunnell's (or Velez's) selection of employees for layoff did not result in immediate action. In May 2012, Velez assigned Katti to the task of managing the testing for a client's dental products, an assignment she characterizes as a "last chance effort to determine Katti's ability as a manager." (*Id.* ¶ 21.) The client forwarded the "protocol" (evidently, a written proposal for the work to be performed) to Katti, who later agreed to the client's request for expedited performance. Because Katti did so without warning the client that there would be an increased

4

fee, SGS was required to forfeit the additional payment in order to preserve the client relationship. (SGS Statement ¶¶ 71-75.)

As noted, Katti has not responded, paragraph by paragraph, to Defendant's Local Rule 56.1 Statement. He has, however, presented facts that, in his view, support his belief that he was the victim of discrimination at the hands of Gayla Velez. Plaintiff notes that over the course of his tenure with SGS, he was "never written up nor spoken to about performance" except for one instance in the late winter of 2011 during which Gayla Velez warned Plaintiff she would write him up "for some trivial matter" but did not follow through. (Pl.'s Resp. ¶ 1; Katti Dep. at 159-60.) Plaintiff asserts that Ms. Velez never discussed any performance issues with him, and never gave him a written performance improvement plan or performance evaluation. (*Id.* ¶¶ 2, 6.) Notably, Bunnell and Velez appeared to recognize that such feedback could be constructive: although he has not placed copies of the relevant documents in the record, Katti's memorandum in opposition to summary judgment quotes from a series of e-mails, exchanged weeks after the layoff decision, in which Bunnell and Velez discussed preparation of a Performance Improvement Plan ("PIP") for Katti. (Pl.'s Resp. to Def.'s Mot. for Summ. J. [115] at 8-9.) Yet such a plan was apparently never furnished.[2] Nor did Plaintiff receive what he perceives to be appropriate oral feedback. In contrast with the women who reported to her, with whom Ms. Velez "spent hours in her office," Plaintiff claims, Ms. Velez "hardly spent 20 seconds at any moment speaking with" him. (*Id.* ¶ 7; Interrog. Answers at 12; Katti Dep. at 181-82.)

Plaintiff complains, further, that Gayla Velez did not assign work to him "that contributed to the bottom line financially," instead directing him to work on projects that had languished for months without progress. (Pl.'s Resp. ¶ 8.) According to Katti, he achieved good results on

---

[2] The court is uncertain, in any event, of the sincerity of SGS's commitment to use of a PIP as a tool for assisting employees with performance issues. As reflected in an e-mail exchange between Bunnell and Castle in May 2012, Bunnell put one employee, "G.S.," on a PIP, but evidently assumed it would be unsuccessful. In the same message, Bunnell identified "G.S." as an employee "to be let go in 2 weeks or less for performance issues." (5/23/2012 e-mails, Ex. E to Bunnell Decl. (103-5 at 32).)

these projects (identified as the "fluocinonide project" and "2 other method development projects"), but Velez identified them as work the company was required to complete to maintain good customer relations, and acknowledged that "we don't make any money on these projects." (*Id.*)  Katti claims he also performed well on a "Performance Qualification" project involving an oxygen analyzer and on a project referred to as the "Malvern project" or the "Colgate project." (*Id.* ¶¶ 9, 10; Katti Dep. at 138-9.)  Just two weeks before his termination, Katti contends, he met with Gayla Velez in her office, pointed out that "every week someone is let go for performance" and asked her whether he "ha[d] anything to be worried about."  Velez responded, "No."  (*Id.* ¶ 11; Interrog. Answers at 12; Katti Dep. at 200.)

In interrogatory answers submitted in opposition to summary judgment, Katti has provided more detail concerning his difficulties with Gayla Velez.  He claims that in his first few days on the job, Ms. Velez "stormed into" his office and announced that she would not train him. (Interrog. Answers, at 6; Katti Dep. at 147, 148, 150, 170.)  On another occasion, Katti claims, Velez commented that "men don't multi-task as well as women" and she had "a whole lab full of people" to prove it.    (Katti Dep. at 171.)  She specifically refused to allow Katti to supervise another worker on spectroscopy equipment with which he was familiar.  (Interrog. Answers at 6.)

Plaintiff claims Velez demonstrated hostility toward other men, as well.  He observed that she "screamed at" Bunnell (her supervisor) during meetings and sat at lunch only with women.  (*Id.* Interrog. Answers at 7.)   On some unspecified date, Katti testified, Bunnell told Katti that Gayla Velez intimidated Bunnell himself, and that he dreaded going to her office to speak to her.  (*Id.* at 9; Katti Dep. at 172.)  In September 2011, another male, Robert Payson, the manager for "Metrology/Facilities," asked Plaintiff how he was able to tolerate the harsh tone Gayla Velez used in communicating with him.  (Interrog. Answers at 9; Org. Chart [103-4] at 18.) Payson and two other workers told Plaintiff, in the fall of 2011, that Gayla Velez was intimidating and that it appeared to them that she treated women more favorably than men.  (*Id.* at 10; Katti

Dep. at 177.) In November or December of 2011, Payson told Plaintiff that he was "terrified" of Ms. Velez and that he would never want to be in a position of reporting to her. (Katti Dep. at 175, 176.) A worker named Soja told Plaintiff, on an unidentified date, that he should "be careful of Gayla she gives the white women in the Chromatography group first opportunity to do the best assignments." (Interrog. Answers at 13.) In the spring of 2012, when Katti approached Len Wojtowictz, the male director of Quality Assurance, for assistance in getting Gayla Velez's signature on a document, Wojtowictz told Katti that he, too, was "afraid of Gayla." (Katti Dep. at 172, 173.) Though some of these expressions of fear are hearsay, others came from SGS's management staff. In any event, in light of Plaintiff's *pro se* status and the fact that he no longer has ready access to these witnesses, the court is inclined to admit the evidence that other male workers found working with Ms. Velez stressful, as Plaintiff did.

## DISCUSSION

As noted, Plaintiff's complaint alleges that he was the victim of sex discrimination, national origin discrimination, and retaliation. During the course of the litigation, Plaintiff has suggested that Defendant discriminated against him because of his gender reassignment, as well. That claim requires only brief attention. The court disapproves of discrimination on any such basis, but it is not prohibited by Title VII. *See Ulane v. E. Airlines, Inc.* 72 F.2d 1081 (7th Cir. 1984); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007), cited in *Creed v. Family Express Corp.*, No. 3:06–CV–465RM, 2009 WL 35237 (N.D. Ind. Jan. 5, 2009). The matter of gender reassignment was not mentioned in any of Plaintiff's administrative filings, nor in the complaint he filed with this court. And, as Defendant points out, there is no evidence that any of Defendant's agents or managers were aware of Plaintiff's gender reassignment before this litigation began. The fact that Defendant may have performed a background check prior to his hire is plainly insufficient to establish such knowledge. Plaintiff admitted he has "no independent knowledge" that Ms. Velez herself was aware of his gender reassignment. (Katti Dep. at 170.)

National origin discrimination and retaliation are prohibited by Title VII, but Plaintiff's submissions defeat those claims, as well. As Defendant notes, though he identifies as East Indian, Plaintiff acknowledged that he was born in the United States and that his birth certificate lists his race as "white." (*See* Katti Dep. at 161, 214-15.) More importantly, he identified no circumstances that suggest his national origin had any relationship to Ms. Velez's allegedly harsh treatment of him, nor his discharge. Katti testified that he complained every week in the fall of 2011 that Velez was intimidating him, specifically calling her out after she made what he deemed intimidating remarks. (*Id.* at 186, 208-09.) Such frequent complaints might well have been vexing to any busy supervisor. Still, Katti offers no evidentiary basis for the conclusion that it was those complaints themselves that resulted in adverse action.

Instead, the thrust of Katti's case is that Velez disliked men, treated women more favorably, and denied him appropriate training, staff, and job assignments. As a result, Katti was one of just two chemistry department employees (both male) who were laid off by SGS in June 2012. SGS argues that the evidence is insufficient to create a dispute of material fact on this claim. To demonstrate this, SGS reviews the familiar elements for proof of a prima facie case of discrimination under the "indirect method": that (a) plaintiff is a member of protected class who (b) performed his job satisfactorily but (c) suffered an adverse job action, and (d) that similarly-situated employees outside of the protected class were treated more favorably. *See, e.g., Eaton v. Ind. Dep't of Corr.,* 657 F.3d 551, 554 (7th Cir. 2011); *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 978 (7th Cir. 2004). Plaintiff claims membership in a protected class on the basis of his sex, male; and there is no dispute that his termination by SGS constitutes an adverse job action. Defendant urges, however, that the evidence shows Plaintiff was not meeting SGS's legitimate performance expectations. (Def.'s Mem. in Supp. of Summ. J. [103], hereinafter "Def.'s Mem.," at 11.) Indeed, the only evidence that Plaintiff was performing satisfactorily comes from Plaintiff himself. The "self-serving" nature of this evidence does not render it inadmissible, of course. *Hill v. Tangherlini*, 724 F.3d 965, 967-68 (7th Cir. 2013). Still,

Plaintiff's own assessment of his merit may be insufficient to create a dispute of fact on this issue. *Mills v. First Fed. Sav. & Loan Ass'n,* 83 F.3d 833, 843 (7th Cir. 1996). If Katti's poor job performance by itself was the reason he was selected for layoff, SGS is entitled to prevail.

But in recent decisions, the Seventh Circuit has cautioned against a wooden application of the indirect method of proof, and it is well recognized that a plaintiff may resist summary judgment by presenting circumstantial evidence of discriminatory animus. To prevail under this method, Plaintiff must "construct a convincing mosaic" that would allow the jury to draw an inference of discrimination. *Brown v. Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1005 (7th Cir. 2012). Still more recently, the Court of Appeals has "opined that the time has come to jettison the 'ossified direct/indirect paradigm' in favor of a simple analysis of whether a reasonable jury could infer prohibited discrimination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013) (citing *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 737 (7th Cir. 2013); *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)). In assessing the record under this approach, the court reads the evidence in the light most favorable to the non-moving party, particularly one who, as in this case, is unrepresented.

Viewed through this lens, Katti's sex discrimination claim survives summary judgment, if barely so. Katti had held only academic positions prior to being employed by SGS (Katti Dep. at 127-28), and the record supports an inference that his job performance issues may have been a function, at least in part, of lack of training. For example, SGS criticizes Katti for having agreed to a client's request for expedited performance without warning the client that there would be an increased fee; but SGS offers no evidence that Katti was aware of the practice of imposing such a fee. By Katti's account, his direct supervisor, Gayla Velez, was impatient with him from the very beginning of his employment at SGS. Just days after his arrival, he claims, she announced that she would not train him. Yet Velez was generous with her time with female subordinates, Katti asserts. She openly commented that women employees are better at "multi-tasking" than men, pointing to her own female employees as evidence. Katti had been assured, during his

9

interview, that he would have staff reporting to him following an anticipated reorganization (Katti Dep. at 131), but Velez chose not to proceed with that plan. Defendant asserts it was common practice to delay assigning staff to new managers, but Katti notes that months after his termination, when his female replacement was hired, she had staff reporting to her immediately. Katti has identified a number of male co-workers who, he claims, agreed that Velez was a difficult manager, and both male and female co-workers who concluded that she treated female employees more favorably. Katti notes, too, that a female assistant manager was slated for layoff from the chemistry department but ultimately spared, despite her own poor performance record, after Velez intervened in the decision.

Perhaps most significant is the fact that, though Katti was hired for a significant management position after a lengthy search, he claims to have received no written or oral feedback or criticism of his work performance. SGS notes Katti's admission that on one occasion he had "failed to contemporaneously record his development," (Velez Decl. ¶ 14), but that single purported admission is insufficient, in the court's view, to eliminate any dispute of fact on this issue, particularly where SGS itself failed to document the admission or management's response to it. Velez and Bunnell contemplated, but never prepared, a PIP for Katti. Then, just two weeks before the discharge was announced, and weeks after the decision had been made, Katti asked Velez whether he "had anything to worry about," and she assured him he did not. If job performance really were a genuine and significant concern, Velez could well have spoken up at this point.

In support of its motion, SGS emphasizes the "same actor" inference. Specifically, because Bunnell and Velez were involved in hiring Katti in September 2011, SGS contends, there is a "strong presumption" that the decision to terminate him just nine months later was not unlawfully motivated. (Def.'s Mem. at 9-10 (citing *EEOC v. Our Lady of the Resurrection Medical Center*, 77 F.3d 145, 152 (7th Cir. 1996).) The Court of Appeals has explained, however, that it is "misleading to suggest" that where the same person both hires and fires an

employee, those circumstances "create[] a 'presumption' of nondiscrimination . . . ." *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 747 (7th Cir. 2002). Instead, the "same actor" inference is "something for the trier of fact to consider." *Id.* That advice seems particularly appropriate here, where Velez was but one of four persons who interviewed and hired Katti (Katti Dep., at 128), but was his sole direct supervisor. In short, the court is not prepared to say that no reasonable jury could find in favor of Katti on his sex discrimination claim. On that claim alone, the motion for summary judgment will be denied.

## CONCLUSION

Defendant SGS's motion for summary judgment [102] is granted in part and denied in part. Plaintiff's claim of discrimination on the basis of gender reassignment is not properly before the court and is unsupported by the evidence. Nor has Plaintiff presented evidence that creates any disputes of fact concerning his claims of national origin discrimination or retaliation. Viewing the record in the light most favorable to him, however, the court concludes he has presented sufficient circumstantial evidence to survive summary judgment on his sex discrimination claim. With respect to that claim, the motion is denied.

ENTER:

Dated: March 13, 2014

_____
REBECCA R. PALLMEYER
United States District Judge